UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | : | |
|---|---|---|
| PAUL H. SMITH, | : | CASE NO. 1:21-cv-00160 |
| | : | |
| Plaintiff, | : | OPINION & ORDER |
| | : | [Resolving Doc. 28] |
| v. | : | |
| | : | |
| CUYAHOGA COUNTY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In this case, the Court considers whether a longtime Cuyahoga County ("the County") Sewer Division employee can survive summary judgment on disability and race discrimination claims against the County.[1] This Court principally examines whether sufficient evidence shows that Plaintiff Smith could return to work with reasonable accommodations.

Finding that the employee is not a qualified individual under the Americans with Disabilities Act ("ADA") and that he has not identified a similarity situated employee who received better treatment, the Court **GRANTS** the County's summary judgment motion.[2]

---

[1] Smith's Ohio disability discrimination claims are resolved on the same basis as his federal claim. *See Hedrick v. W. Rsrv. Care Sys.,* 355 F.3d 444, 452 n.4 (6th Cir. 2004).
[2] The Court does not consider Doc. 31, Plaintiff Smith's second reply document, which was filed without leave of Court. Local R. 7.1.

Case No. 1:21-cv-00160
GWIN, J.

I. Background

### A. Smith Joins Public Works

Plaintiff Paul Smith, who is African American, grew up in Cleveland.[3] He did two years of college at Adrian College in Michigan, where he was a wide receiver on the football team.[4]

Smith moved back to Cleveland and eventually took a full-time custodian job with the County.[5] For four years he worked the night shift at the Cleveland Justice Center and was later transferred to the Jane Edna Hunter Building.[6]

Around 2006, seeking daytime employment, Smith accepted a position with the County Public Works Sewer Maintenance Division ("Sewer Division") as an entry-level sewer maintenance worker.[7] The Sewer Division is responsible for periodically accessing, cleaning and digging up sewer lines and related components that are typically located under streets.[8] Within the Sewer Division, there are several different crews.

Smith first worked on the crew that monitored water levels inside the main sewer lines.[9] This job involved physically opening sewers and running tests to make sure, in Smith's words, "everything is going where it's supposed to go."[10]

From there, Smith received two promotions.[11] In 2008, he was promoted to the position of Operator.[12] And about a year later, he was promoted to Jet Vac Operator.[13] In

---

[3] Doc. 22 at 12.
[4] *Id.* at 13.
[5] *Id.* at15.
[6] *Id.*
[7] *Id.* at 21.
[8] Doc. 28-3 at 2.
[9] Doc 22 at 23.
[10] *Id.* at 24, 25.
[11] *Id.* at 33.
[12] *Id.*
[13] *Id.*

- 2 -

Case No. 1:21-cv-00160
GWIN, J.

that role, a typical day involved opening a manhole and operating a high-pressure hose to clean the sewer.[14]

### B. Smith Is Promoted to Leadman

Around 2010, Smith applied for the position of Leadman.[15] A Leadman works as working jobsite supervisors who also do physical labor.[16] Smith did not apply to be a Leadman on a specific Sewer Division crew; he applied for a general Leadman position.[17]

Smith received the Leadman promotion.[18] His supervisors told him that in his new role, the Sewer Division would mainly assign Smith to work with the Sewer Division's Camera Trucks.[19] The Camera Truck crew runs robotic cameras in the sewer lines.[20] Smith was initially hesitant as he had developed expertise working with the Jet Vac device, but he accepted the new assignment when his supervisors told him that they had confidence in his abilities.[21]

On a typical day, employees drive the Camera Truck to a jobsite.[22] The truck incorporates considerable electronic equipment.[23] A generator powers the truck.[24] In a typical assignment, an employee opens the sewer.[25] And then, using poles, a robotic camera is lowered into the sewer.[26] Generally, the job does not require entering the sewer,

---

[14] *Id.* at 39–40.
[15] *Id.* at 44.
[16] Doc. 22-6 at 1.
[17] Doc. 22 at 44.
[18] *Id.* at 45.
[19] *Id.*
[20] *Id.* at 55.
[21] *Id.* at 46.
[22] *Id.* at 57.
[23] *Id.* at 56.
[24] *Id.*
[25] *Id.* at 58.
[26] *Id.*

Case No. 1:21-cv-00160
GWIN, J.

although it is sometimes necessary to enter the sewer to retrieve the camera in emergencies.[27]

Over time, Smith became skilled in his Camera Truck duties.[28] He enjoyed the work.[29] And he eventually passed a certification exam and received a license to operate the robotic camera.[30]

As Leadman, Smith also performed work other than in the Camera Truck.[31] Smith testified that he worked "in almost every department."[32] He worked with the crews that visited residents' homes, with crews that did construction, and with crews that operated the vacuum devices.[33] And, near 2015, the County sought to have Smith observe more experienced workers in the construction crew so that he could become more proficient with that work.[34]

In 2018, the County took Smith and another Leadman, Ted Choukas—who is white—off their respective Camera Truck assignments and moved them to construction work.[35] According to the County, the Sewer Division's clients had requested that the Division focus on a backlog of sewer repair and maintenance projects and there was less Camera Truck Sewer Inspection services demand.[36]

Smith and Choukas filed an Unfair Labor Practice charge challenging this move to construction work.[37] Smith contends that he was singled out for the assignment change as

---

[27] *Id*; *See also* Doc. 28-3 at 4.
[28] Doc. 22 at 61.
[29] *Id.* at 60.
[30] *Id.* at 50–51.
[31] *Id.* at 61;
[32] *Id.* at 62.
[33] *Id.*
[34] *Id.* at 70.
[35] *Id.* at 76.
[36] Doc. 28-3 at 2.
[37] Doc. 22-15.

- 4 -

Case No. 1:21-cv-00160
GWIN, J.

compared to other Leadmen.[38]  The Ohio State Employment Relations Board ultimately investigated and dismissed the charge with prejudice.[39]  The Board held that the County had "the inherent managerial right" to assign Smith and Choukas to the construction work under the Collective Bargaining Agreement.[40]

The County also says that it did not view Smith and Choukalas' construction assignment as permanent.[41]

### C. Smith is Diagnosed with Asthma

In the fall of 2018, Smith started experiencing serious respiratory problems.[42]  He exhibited a severe cough that he knew was not "normal" and was spitting up a white substance.[43]

Smith went to the emergency room.[44]  The doctors there thought he had a nasal infection and prescribed him antibiotics.[45]  But his symptoms kept getting worse.  He eventually saw a pulmonary specialist who diagnosed him with asthma.[46]

### D. Smith Worker's Compensation Claim Is Accepted

After Smith was diagnosed with asthma, he filed a Worker's Compensation claim "to document where [he] got the injury from."[47]

On November 29, 2018, Smith saw a doctor for the Worker's Compensation claim.[48]  This visit produced a MEDCO-14 form, which is a form that heath care providers

---

[38] Doc. 22 at 79 ("I think they violated [the Collective Bargaining Agreement by] not making sure that everybody is treated equally and fairly in their process.").
[39] Doc. 22-16.
[40] Id.
[41] Doc. 22-15 at 3.
[42] Doc. 22 at 96.
[43] Id. at 95–96.
[44] Id. at 99.
[45] Id.
[46] Id. at 100.
[47] Id.
[48] Id. at 103  (referencing Doc. 22-57).

- 5 -

Case No. 1:21-cv-00160
GWIN, J.

submit to state authorities to certify that an injured worked is disabled as a result of a work injury.[49]

In this physician-completed form, the doctor determined that Smith was not able to return to "the full duties of [his] job held on the date of the injury" even with restrictions of "no exposure to chemicals, gases, fumes, concrete, [and] dust."[50] The form described Smith's condition as "occupational asthma" and said he had a "continued chronic cough."[51]

Altogether, between November 2018 and October 2020, Smith filed seven respiratory-related MEDCO-14 forms to continue his disability benefits that offer substantially similar evaluations. These medical reports describe Smith as unable to work at his former position.

Smith's Worker's Compensation Claims have been allowed.[52] He continues to receive regular temporary total disability payments.[53]

In addition, Smith later filed MEDCO-14 forms related to his mental health conditions.

### E. The County Sends Smith Home

After the emergency room visit, Smith went back to work.[54] His Union representatives met with his County supervisors about Smith's health conditions and that resulted in the County assigning Smith out of the construction crew. In the new

---

[49] *Id.* at 102.
[50] Doc. 22-57.
[51] *Id.*
[52] Doc. 22 at 116.
[53] *Id.* at 119.
[54] *Id.* at 130.

- 6 -

Case No. 1:21-cv-00160
GWIN, J.

assignment, at least some of the work Smith did was typically done by lower-level employees.[55]

After Smith submitted the first Worker's Compensation claim, County officials including Sewer Division management, the Worker's Compensation Coordinator, and Human Resources staff determined that Smith could not safely work in the Leadman position given his work restrictions.[56] The County says:

> The decision that Smith could not serve as Leadman was based on the fact that every environment [in which] the Leadman works involves accessing existing sewers or working at construction sites with excavations of buried sewer lines that would expose him to the irritants to which he could have no exposure pursuant to his work restrictions: dust, chemicals, asphalt, clay, concrete, etc., which pose no particular hazard to most workers.[57]

On December 6, 2018, Smith was sent home.[58] In a meeting, County Human Resources Representative Ciara Stone told him that she had received one of Smith's MEDCO-14 forms from County Worker's Compensation Coordinator Cishma Haines.[59] According to Smith, Stone told him that he couldn't be on the job because of the Worker's Compensation claim.[60] Smith went home.[61] He has not since returned to work.[62]

### F.  Smith Files an ADA Accommodation Request

On December 12, 2018, Smith filed an ADA accommodations request.[63] The accommodation he requested was: "No exposure to chemicals, cases, fumes, silica, asbestos, and dust."[64] The form was signed by one of the doctors who treated Smith for his

---

[55] *Id.* at 135.
[56] Doc. 28-3 at 4.
[57] *Id.*
[58] Doc. 22 at 136.
[59] *Id.* at 138.
[60] *Id.* at 137.
[61] *Id.* at 140.
[62] *Id.*
[63] Doc. 22-10.
[64] *Id.*

- 7 -

Case No. 1:21-cv-00160
GWIN, J.

earlier Worker's Compensation claim.[65] The doctor listed Smith's disability as chronic obstructive pulmonary disease (COPD) and indicated that Smith's duration of impairment was five-months or longer.[66]

Sometime in December 2018, Smith presented to the County a medical report from Dr. Ziad Shaman.[67] This brief letter says that Smith was cleared to return to work with the restrictions of: "Minimize exposure to dust, fumes, or possible breathing irritants.[68]

On March 18, 2019, Smith filed a second and substantially similar ADA request.[69]

### G. Smith Undergoes an Independent Medical Examination

Worker's Compensation Coordinator Haines helped set up an independent medical exam for Smith.[70] She said she scheduled this exam because Smith indicated that he had been exposed to asbestos and silica.[71] County Human Resources Specialist Brian Adams also suggested that the independent medical exam was prompted from the conflict between the MEDCO-14 forms and Dr. Shaman's assessment.[72]

In a February 13, 2019 document titled: "Independent Medical Examination," Dr. David Garcia assessed Smith's condition based on a review of his medical records and a physical exam.[73] Dr. Garcia determined that Smith suffered from occupational asthma.[74] Dr. Garcia also determined that Smith was "not capable of returning to the essential

---

[65] Id.
[66] Id.
[67] Doc. 22 at 207.
[68] Doc. 24-1.
[69] Doc. 22-11.
[70] Doc. 25 at 35.
[71] Id; Doc. 24 at 21.
[72] Doc. 23 at 16.
[73] Doc. 24-2.
[74] Id. at 3.

- 8 -

Case No. 1:21-cv-00160
GWIN, J.

functions of [his] exact position due to the different varieties of potential allergens that he had been exposed to."[75]

### H.  Smith's ADA Request Is Put "On Hold" and He Is Disability Separated

On April 10, 2019, County Employee and Labor Relations Specialist Brian Adams wrote Smith a letter saying that Smith's ADA request was "on hold because an independent medical examination found [him] not fit for duty."[76]  The letter made direct reference to Dr. Garcia's report.[77]  It also stated that Smith should contact Adams if Smith became "medically cleared to return to full duty."[78]

Smith ultimately went on unpaid medical leave.[79]

On July 23, 2019, Smith and a Union representative met with several County officials to discuss his employment situation.[80]  The meeting did not produce a resolution.[81]

On December 5, 2019, Employment and Labor Relations Specialist Adams informed Smith in a letter that, in accordance with County policy, he would be disability separated effective the following day.[82]  The letter also informed Smith that he could request to be reinstated if he could provide "substantial, credible medical evidence that [he] is once again capable of performing the employee's essential job duties."[83]

On March 7, 2020 Smith emailed Adams requesting to be reinstated.[84]  He included two documents.  The first document was a MEDCO-14 form in which the doctor checked a

---

[75] *Id.* at 4.
[76] Doc. 22-12.
[77] *Id.*
[78] *Id.*
[79] Doc. 22 at 180.
[80] *Id.* at 192.
[81] *Id.* at 201.
[82] Doc. 22-7.
[83] *Id.*
[84] Doc. 22-21.

- 9 -

Case No. 1:21-cv-00160
GWIN, J.

box indicating that Smith could not return to the full duties of his former position.[85] The second document is a February 28, 2020 letter from Dr. Ziad Shaman that said that Smith was given clearance to return to work with the "recommendations" of "minimiz[ing] exposure" to certain substances.[86]

Adams did not respond to Smith's request.[87] Adams said that he discussed the request with Human Resources Manager Yolanda Guzman and that because the documents Smith submitted did not reflect a change in his medical condition, his request was not considered a formal request for reinstatement.[88]

## II. Standard of Review

A court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[89] There is a genuine dispute as to a material fact when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."[90]

The Court "view[s] the evidence in the light most favorable to the nonmoving party."[91] But, the nonmoving party "must show sufficient evidence to create a genuine issue of material fact"[92] as to each of the claim's required elements.[93] Summary judgment may be granted "[i]f the evidence is merely colorable . . . or is not significantly probative."[94]

---

[85] *Id.* at 2.
[86] *Id.* at 3.
[87] Doc. 24 at 52.
[88] *Id.* at 53.
[89] Fed. R. Civ. P. 56(a).
[90] *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[91] *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020) (citing *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)).
[92] *Klepper v. First Am. Bank*, 916 F.2d 337, 341–42 (6th Cir.1990) (citation omitted).
[93] *Id.* (noting that a scintilla of evidence is not enough to defeat a summary judgment motion).
[94] *Anderson*, 477 U.S. at 250–51.

Case No. 1:21-cv-00160
GWIN, J.

Plaintiff represents himself. *Pro se* pleadings are liberally construed and held to less stringent standards than counsel-drafted pleadings.[95] The Court broadly reads Plaintiff's filings to determine his claims' legal underpinnings.

### III. Discussion

#### A. ADA Claims

The ADA is a federal law that "seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity."[96]

To fall under the law's protection, a plaintiff must be a "qualified individual" with a disability.[97] By the statute's terms, a "qualified individual" is a person "who [ . . . ] can perform the essential functions" of his or her job, including those who can do so only "with [ . . . ] reasonable accommodation."[98] This means that "an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job."[99]

Smith's complaint sets out three distinct ADA claims: That he was treated differently than other employees because of his disability, that the County failed to provide reasonable accommodations in violation of the ADA, and that the County retaliated against him because of his ADA request. Even after using the liberal pro se pleading standard, the Court finds his arguments at summary judgment hard to parse.

---

[95] *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) ("Pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings.").
[96] *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 801 (1999) (citing 42 U.S.C. §§ 12101(a)(8),(9)).
[97] 42 U.S.C. § 12112(a).
[98] *Id.* at § 12111(8).
[99] *Lockhart v. Marietta City Sch.*, No. 20-4308, 2021 WL 4810172, at *9 (6th Cir. Oct. 15, 2021) (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc)).

Case No. 1:21-cv-00160
GWIN, J.

Each of Smith's ADA claims fail because no reasonable juror could find that Smith was able to perform the essential duties of a Sewer Division Leadman.

### i. Leadman Duties

To determine what job aspects are essential duties, courts examine "the employer's judgment as to what functions of a job are essential" and "written descriptions of the job."[100] Some courts also look to the largely similar factors in the ADA regulations.[101]

Although Smith's complaint suggests that Smith's job duties were limited to the Camera Truck,[102] evidence shows that Smith's Leadman responsibilities extended to the full range of Sewer Division work.

The Leadman job description says that Leadman must complete work "involving storm and sanitary sewer line repair, rehabilitation, cleaning, evaluation, and other activities."[103] This job-duty list is broader than the Camera Truck duties. The job description also says that "[a]ssignment to permanent crews or vehicles is not possible."[104]

The Court also finds that the history of the Collective Bargaining Agreement negotiations supports this broader understanding of Leadman duties. In a previous bargaining agreement, there was a position called a "TV tech."[105] But the current agreement consolidated that position into the Leadman position.[106]

Additionally, in his own deposition, Smith says the same. When asked if he understood that part of his job involved work outside the Camera Truck, he answered in

---

[100] *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 985 (6th Cir. 2011).
[101] *See Green v. BakeMark USA, LLC*, 683 F. App'x 486, 492 (6th Cir. 2017) (quoting 29 C.F.R. § 1630.2(n)(3)).
[102] Doc. 1 at 49–50.
[103] Doc. 22-6.
[104] *Id.*
[105] Doc. 23 at 13.
[106] *Id.* at 14.

- 12 -

Case No. 1:21-cv-00160
GWIN, J.

the yes.[107] He also acknowledged that he regularly worked on all Sewer Division crews, not just the Camera Truck crew.

### ii. Smith's Ability to Perform the Leadman Duties

The County relies on Smith's seven breathing-related MEDCO-14 forms and Dr. Garcia's independent medical exam to argue that Smith was not able to perform Leadman duties.[108] Taken together, these medical assessments establish that Smith cannot be exposed to certain substances including "chemicals, cases, fumes, silica, asbestos, and dust."[109] Because all Sewer Division Leadman "routinely work with concrete, dust and silica, and many of the sewer lines are made of concrete, clay, and similar materials,"[110] the County says that no accommodation could make it possible for Smith to avoid exposure to these substances.

Precedent supports the County's position that, given Smith's work environment, the doctor-prescribed limits on his exposure to certain substances prevent him from being an ADA qualified employee.

At the outset, the U.S. Supreme Court has said that when there is an "apparent contradiction that arises out of [an] earlier [ . . . ] disability claim" and an ADA claim, the plaintiff must provide a "sufficient explanation" explaining the contradiction.[111] In that Supreme Court case, the ADA plaintiff had received federal Social Security Disability

---

[107] Doc. 22 at 62.
[108] The County also relies on Smith's mental health-related MEDCO-14 forms, but the Court does not find it necessary to consider that argument as the case is capable of being resolved on the breathing issues alone. *See* Doc. 28-1 at 19.
[109] Doc. 22-10.
[110] Doc. 28-3 at 4.
[111] *Cleveland*, 526 U.S. at 806; *cf. id.* 802 (noting that disability and ADA claims do not "inherently conflict"); *see also see also Neview v. D.O.C. Optics Corp.*, 382 F. App'x 451, 458 (6th Cir. 2010) (quoting *Williams v. London Util. Comm'n*, 375 F.3d 424, 429 (6th Cir.2004) (finding that ADA plaintiff failed to provide sufficient explanation in light of Michigan disability benefit award).

- 13 -

Case No. 1:21-cv-00160
GWIN, J.

Insurance payments that were based on a finding that the plaintiff was "unable to do [her] previous work" and "cannot … engage in any other kind of substantial gainful work which exists in the national economy."[112]

Smith's Ohio total temporary disability claims were allowed. Under Ohio law, "temporary total disability is defined as a disability which prevents a worker from returning to [her or] his former position of employment."[113]

Accordingly, the issue here is whether Smith can explain how he can perform his essential Leadman duties in light of the doctor-submitted Ohio temporary total disability forms—and the Dr. Garcia report—which indicate that he is unable to return to work, even with restrictions.

On each of the seven respiratory-related MEDCO-14 forms, physicians checked a box indicating that Smith was not able to return to work even "[i]f there are restrictions."[114] Smith does not address these forms at summary judgment.

Smith says that Dr. Garcia's exam only considered whether Smith could perform construction-related duties and it did not consider whether Smith was able to work with other crews.[115] However, even if this is true, Smith's inability to do the construction work bars his claim from going forward since Leadman perform some construction work.

Smith also points to the Dr. Shaman report which technically cleared Smith to return to work in a brief December 11, 2018, letter report.[116] While this letter does support

---

[112] *Cleveland*, 526 U.S. at 797 (quoting 42 U.S.C. § 423(d)(2)(A)).
[113] *State ex rel. Crim v. Ohio Bur. of Workers' Comp.*, 751 N.E.2d 990, 993 (Ohio 2001) (citations omitted); *see also Wheat v. Columbus Bd. of Educ. Columbus Pub. Sch.*, No. 2:13-CV-819, 2015 WL 4039356, at *4 (S.D. Ohio June 30, 2015), *aff'd*, 644 F. App'x 427 (6th Cir. 2016) (relying on Ohio temporary total disability claim to find plaintiff not qualified under ADA).
[114] *See, e.g.*, Doc. 22-21 at 2 (Nov. 11, 2019 MEDCO-14).
[115] Doc. 29.
[116] Doc. 24-1.

- 14 -

Case No. 1:21-cv-00160
GWIN, J.

Smith's position, it does not create a genuine dispute of fact. As Smith himself acknowledged at his deposition, Dr. Shaman's assessment imposes substantially similar restrictions on Smith's exposure to possible breathing irritants as the MEDCO-14 forms.[117]

The Sixth Circuit's decision in *Horn v. Knight Facilities Mgmt.-GM, Inc.*[118] further stops Smith's ADA claim. In that case, the Court determined that a physician's assessment that a janitor could not be exposed to certain cleaning substances established that the junior was not an ADA qualified individual.[119] Specifically, the court rejected the janitor's "personal belief that she could handle cleaning solutions" as reason for denying summary judgment in favor of the defendant employer.[120] Smith's personal belief that he is able to do perform Leadman duties despite the medical assessments therefore fail.

Lastly, the Court notes that Smith's refences to materials from the U.S. Equal Employment Opportunity Commission website are not relevant to his case. As noted above, to bring an ADA claim, Smith must *first* show that he is qualified to perform the work. He has not here made that showing.

   B. Race Discrimination Claim

To bring a race discrimination claim, Smith "must show that he was 'similarly situated' 'in all of the relevant respects' to an employee of a different race who was treated better."[121] Smith identifies Leadman Ted Choukalas as such a person, but Choukalas's situation is different from Smith's in two key respects.

---

[117] Doc. 22 at 210.
[118] 556 F. App'x 452 (6th Cir. 2014).
[119] *Id.* at 455.
[120] *Id.* at 456.
[121] *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (quoting *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 768 (6th Cir. 2004)).

- 15 -

Case No. 1:21-cv-00160
GWIN, J.

First, although Choukalas did file a substantially similar Worker's Compensation claim to Smith, it was not allowed.[122] This means that, unlike Smith, the Ohio Bureau of Workers Compensation did not find Choukalas temporarily totally disabled.

Second, an independent medical assessment determined that, unlike Smith, Choukalas was fit for duty.[123]

Because Choukalas is not similar situated to Smith, Smith's race discrimination claim fails.

### IV. Conclusion

For nearly two decades, Smith served his community, doing hard and difficult work. From these jobs, he developed a serious health condition that impairs his daily life. Yet, at critical junctures, both the County and Smith's Union stopped responding to him, forcing him to turn to the courts.[124]

Smith says that his goal was to "get back to work."[125] Now that this lawsuit is resolved, the Court expresses its hope that he will be able to return to work, in some capacity.

The Court GRANTS Defendant's motion for summary judgment.

IT IS SO ORDERED.

Dated: January 3, 2022                    *s/    James S. Gwin*
                                          JAMES S. GWIN
                                          UNITED STATES DISTRICT JUDGE

---

[122] Doc. 25 at 46.
[123] *Id.*
[124] Doc. 24 at 52 (County); Doc. 22 at 202–03 (Union).
[125] Doc. 22 at 187.